O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| J.H., a minor, by and through his parents, GEORGE HESSE, and JENNIFER HESSE, and on their own behalf,<br><br>  Plaintiffs,<br><br>  v.<br><br>LOS ANGELES UNIFIED SCHOOL DISTRICT; LOS ANGELES UNIFIED SCHOOL DISTRICT SPECIAL EDUCATION LOCAL PLANNING AREA; and DOES 1 to 10,<br><br>  Defendants. | Case No. CV 10-00780 DDP (AGRx)<br><br>**ORDER GRANTING "STAY PUT" PRELIMINARY INJUNCTION**<br><br>[Order to Show Cause Issued February 26, 2010] |

On February 8, 2008, Plaintiffs, J.H., a minor and his parents, filed suit against the Los Angeles Unified School District (the "District"), seeking an order that would (1) reverse a decision of the California Office of Administrative Hearings ("OAH"), dated November 30, 2009, and (2) award relief under the Individuals with Disabilities Education Act, as amended by the Individuals with Disabilities Education Improvement Act of 2004 (collectively the "IDEA"), 20 U.S.C. §§ 1400 et seq. (Compl. ¶ 1.)

Jurisdiction exists pursuant to 20 U.S.C. § 1415(i)(3)(A).

On February 17, 2010, Plaintiffs filed an Ex Parte Application for Temporary Restraining Order to Enforce Stay Put During Pendency of Litigation. The District filed an opposition to the Ex Parte Application on February 19, 2010. On February 26, 2010, the Court issued a Temporary Restraining Order ("TRO") enforcing the Stay Put and an Order to Show Cause ("OSC") why a preliminary injunction should not issue. Prior to the hearing on whether the TRO should be converted into a preliminary injunction, the District filed an opposition brief on March 26, 2010. A hearing was held on March 29, 2010.

After reviewing the papers submitted by the parties and hearing oral argument, the Court hereby issues a preliminary injunction enforcing the "Stay Put" placement described herein

**I. BACKGROUND**

    **A. IDEA**

        1. <u>Statutory Framework</u>

The IDEA seeks "to ensure that all children with disabilities have available to them a free appropriate public education ["FAPE"] that emphasizes special education and related services designed to meet their unique needs and prepare them for employment and independent living." 20 U.S.C. § 1400(d)(1)(A).

Under Part C of the IDEA, states must provide disabled children under the age of three with an Individualized Family Service Plan ("IFSP") setting forth early intervention services the toddler or infant needs. 20 U.S.C. § 1435(a)(4). Under Part B of the IDEA, states must provide disabled children between the ages of three and twenty-one with special education and related services

2

under an Individualized Education Program ("IEP").  20 U.S.C. § 1412(a)(1)(A), (a)(4).

An IEP is a written statement that is developed for each disabled child by an IEP team typically consisting of the parents, a special education teacher, a representative of the local education agency, an expert, and, sometimes, the child.  20 U.S.C. § 1414(d); <u>Christopher S. v. Stanislaus County Office of Educ.</u>, 384 F.3d 1205, 1208 n.1 (9th Cir. 2004).  Parents who are dissatisfied with an IEP may file a complaint triggering a meeting with the IEP team "where the parents of the child discuss their complaint" and the educational agency "is provided the opportunity to resolve the complaint . . . ."  20 U.S.C. § 1415(f)(1)(B)(i)(IV).  If the complaint is not resolved "to the satisfaction of the parents within 30 days of the receipt of the complaint," the parents may request a due process hearing.  <u>Id.</u> § 1415(f)(1)(B)(ii). Following such a hearing, "[a]ny party aggrieved by the findings and decision . . . shall have the right to bring a civil action with respect to the complaint presented pursuant to this section, which action may be brought in any State court of competent jurisdiction or in a district court of the United States," <u>id.</u> § 1415(i)(2)(A).

        2.   <u>"Stay Put" Provision</u>

While such administrative or subsequent judicial proceedings are pending, the "stay put" provision of the IDEA entitles the child to remain in his "current educational placement."  20 U.S.C. § 1415(j); <u>L.M. v. Capistrano Unified Sch. Dist.</u>, 556 F.3d 900, 911 (9th Cir. 2009).  Section 1415(j) provides, in relevant part, that "[d]uring the pendency of any proceedings conducted pursuant to this section, unless the State or local educational agency and the

3

parents or guardian otherwise agree, the child shall remain in the then current educational placement of such child . . . ."

The IDEA does not expressly define "current educational placement." However, courts have generally construed the phrase to mean "the placement described in the child's most recently implemented IEP." Johnson v. Special Educ. Hr'g Office, 287 F.3d 1176, 1180 (9th Cir. 2002). However, § 1415(j) also provides that the state and the parents may "otherwise agree" to an alternative placement, which then becomes subject to the stay put provision. Clovis Unified Sch. Dist. v. Cal. Office of Admin. Hr'gs, 903 F.2d 635, 641 (9th Cir. 1990). Such an agreement concerning the child's pendent placement will be implied where the parents receive a state administrative agency decision in favor of their choice of placement. Id. (discussing Sch. Comm. of the Town of Burlington v. Mass. Dep't of Educ., 471 U.S. 359, 372-73 (1985)). The IDEA's implementing regulations confirm this rule, providing that "[i]f the hearing officer in a due process hearing . . . agrees with the child's parents that a change of placement is appropriate, that placement must be treated as an agreement between the State and the parents" for purposes of the stay put provision. 34 C.F.R. § 300.518(d).

The regulations further provide that when the complaint concerns a child who has turned three years old and is thus transitioning from Part C of the Act to Part B, "the public agency is not required to provide the Part C services that the child had been receiving" under his IFSP. Id. § 300.518(c). However, so long as "the child has been found eligible for special education and related services under Part B and the parent consents to the

4

initial provision of special education and related services . . . the public agency must provide those special education and related services that are not in dispute between the parent and the public agency." Id.

**B.   Factual History**

J.H., the son of George and Jennifer ("Parents"), is a four-year-old boy diagnosed with autism and apraxia who is eligible for special education services under the IDEA. In 2008, J.H. was referred to the District for a comprehensive assessment as part of his transition to Part B of the IDEA at age three. As part of this transition, a school psychologist, an OT therapist, and a speech and language pathologist assessed J.H. in July 2008.

### 1.   First IEP

Following this assessment, J.H.'s IEP team convened for the first time on September 10, 2008, to discuss his initial placement in the District. The District offered to place J.H. in the Preschool Collaborative Classroom ("PCC") at the Westminster Early Education Center for an extended school year. The PCC is a class of fourteen general education students and ten special education students taught by a special education teacher. An occupational therapist ("OT") is present weekly to work with the children's gross motor skills, and several of the special education students have behavioral intervention implementation (BII) aides. The class also incorporates sensory tools needed for children with autism. The goal of the class is to prepare special education children to enter kindergarten.

Parents rejected the District's offer to place J.H. in the PCC at Westminster, indicating that J.H. would instead attend a

licensed preschool at Temple Isaiah at their expense. The District then offered the services of a Preschool Kindergarten Itinerant Teacher ("PKIT"), who would visit the private preschool one to five times per month for a monthly total of 120 minutes in order to consult with the school on strategies for meeting the child's unique needs. The District also offered to provide (1) 120 minutes per month of OT services, (2) 60 minutes per week of OT clinic, (3) 60 minutes per month of Language and Speech ("LAS") instruction, (4) 720 minutes per month of BII with a nonpublic agency ("NPA"), and (5) 180 minutes per month of behavioral intervention development (BID). The meeting recessed so that assessments could be completed in the areas of vision, health, and hearing.

On October 6, 2008, the IEP team reconvened. Parents disagreed with the District's offer of LAS services because they were not specifically directed toward J.H.'s apraxia and requested that the LAS services include one-to-one speech therapy four times per week for 30 minutes per session. However, they consented to the remaining portions of the IEP and to the commencement of the LAS, BII, BID, and PKIT services pending the conclusion of the District's informal dispute resolution.

After the October 6, 2008 meeting, the District failed to provide BII and BID services due to unavailability. The District also failed to provide the offered one hour per week of speech therapy due to unavailability. During this time, J.H. enrolled in the Temple Isaiah preschool program, but was asked to leave after two days due to his behavioral problems. Shortly thereafter, he enrolled in another preschool which also asked him to leave. At the recommendation of his designated PKIT, J.H. enrolled in the

Garden School, a private Jewish school, on the condition that he have a BII aide present. J.H. began attending the Garden School four days per week, from 9:00 a.m. until 12:30 p.m.

On November 13, 2008, the District notified Parents that an NPA, Focus on All Child Therapies ("FACT"), was designated to provide BII and BID services. However, FACT later refused to provide those services because J.H. was not toilet trained and its personnel do not change diapers.

Parents began to provide J.H., at their own expense, with (1) LAS services for three hours per week with an NPA, Milestones Therapeutic Services, and (2) BII/BID services from another NPA, Support and Treatment for Autism and Related Disorders ("STAR"), consisting of 840 minutes per week of BII and 480 minutes per month of BID.

On November 17, 2009, Parents, through their attorney, forwarded a letter to the District's Infant and Preschool Services Division. The letter requested that the District reimburse them for the cost of J.H.'s tuition at the Garden School; notified the District that FACT was an inappropriate BII/BID provider due to their refusal to change diapers; and requested three hours per week of additional LAS in order to deal with J.H.'s severe verbal apraxia. They also notified the District that they had not been contacted by a speech and language therapist to commence the one hour weekly individual speech therapy sessions. Finally, they informed the District that they had obtained the BII/BID services from STAR and speech and language therapy services from Milestone Therapeutic Services.

///

On November 24, 2008Parents, through their attorney, sent another letter to the District's Nonpublic School Department, notifying it that FACT was unable to provide BII/BID services, that they had obtained BII/BID services through STAR instead and would seek reimbursement.  In addition, they requested that the District schedule another IEP team meeting to discuss J.H.'s program and to review independent educational evaluations.  The parties agreed that the new IEP meeting would take place on January 28, 2009.

### 2. Second IEP

On January 28, 2009, the IEP team reconvened. The District made an offer to place J.H. in the Preschool Mixed Class ("PSM") at Westminster School in the morning and in a new program, Kid Intensive Therapy ("KIT"), at Richland School, in the afternoon. In addition, the District offered to provide (1) BII support during the PSM class; (2) BID support totaling six hours per month, with four of the six conducted at the preschool site; and (3) transportation to the PSM and KIT classes.  The offer eliminated individual speech therapy services because speech therapy is integrated into the KIT curriculum.  The IEP Service Summary lists BID services with a frequency of one to five sessions per month totaling 300 minutes; BII services with a frequency of one to five sessions per week for a total of 600 minutes; and LAS services with a frequency of one to five sessions per week, omitting the total weekly minutes.

Parents did not consent to the IEP and instead continued to place J.H. at the Garden School and provide LAS and BII/BID services at their own expense.  J.H.'s parents consented to the school-based and clinic-based OT services, which continued to be

implemented by the District. The District also continued to provide PKIT services within this placement. The District continued to implement PKIT services with this placement.

**C.   Procedural History**

On June 1, 2009, J.H. filed a request for a due process hearing, and several days of hearings before an administrative law judge ("ALJ") with the California Office of Administrative Hearings ("OAH") commenced on September 14, 2009.

On November 30, 20089, the ALJ issued a detailed decision, concluding, in part, that the Garden School is not an appropriate placement, and that J.H. should be placed instead in the PCC at the Westminster Early Education Center. In addition, the ALJ ordered that while J.H. attends the PCC, the District should provide (1) 720 minutes per week of BII services; 180 minutes per month of BID services; 120 minutes per month of OT; 60 minutes per week of OT clinic; and 150 minutes per week of LAS services.

The ALJ also concluded that the District denied J.H. a FAPE with respect to the First IEP's offer of one hour weekly LAS therapy because the District never actually provided those services and because the proper level of speech therapy to treat J.H.'s disability is three to five sessions per week totaling 150 minutes. In addition, the ALJ concluded that the District denied J.H. a FAPE with respect to the First IEP's offer of behavioral services because FACT was unable to meet J.H.'s needs. As a consequence, the ALJ concluded that Parents were entitled to reimbursement for the behavioral services provided by STAR in an amount equal to what the District would have paid FACT and for the LAS services they had obtained for J.H.

Plaintiffs filed a Complaint in this Court on February 8, 2010, appealing the portion of the ALJ's decision finding that the Garden School was not an appropriate placement for J.H.

On February 17, 2010, Plaintiffs filed an Ex Parte Application for a Temporary Restraining Order, essentially asking the Court to issue a stay put order. Plaintiffs argue that this stay put order should include the services agreed upon prior to the due process hearing, including (1) 120 minutes per month of school-based OT; (2) 60 minutes per week of clinic-based OT; and (3) 120 minutes per month of PKIT services, while J.H. continues to attend the Garden School at their expense. In addition, Plaintiffs request that the stay put order require the District to fund 16 hours per week of behavioral services from STAR at $51 per hour and three hours per week of individual LAS services from Milestones at $135 per hour.

On February 19, 2010, the District filed an opposition, arguing that "Plaintiffs should be required to continue to fund the LAS, BII, and BID services for the duration of this Appeal since they disagreed with the initial placement and elected not to place J.H. in the public setting as afforded under 20 U.S.C. § 1415(j), which the ALJ found to be appropriate." (Opp'n 6:2-7.) The District argues that because the ALJ ordered BII/BID and LAS services only in combination with placement in the PCC at Westminster, Plaintiff is not entitled to BII/BID and LAS services while he attends the Garden School pending the outcome of this case.

On February 26, 2010, the Court issued a TRO enforcing the "Stay Put" placement described herein and ordering the District to show cause why the TRO should not be converted into a preliminary

10

1 injunction. The preliminary injunction hearing was continued to
2 March 29, 2010, pursuant to the parties' stipulation. The District
3 filed an opposition on March 26, 2010, essentially reiterating the
4 points it had raised in opposition to Plaintiffs' Ex Parte
5 Application.

**II.   LEGAL STANDARD**

The Ninth Circuit has held that a motion for a stay put order "functions as an 'automatic' preliminary injunction, meaning that the moving party need not show the traditionally required factors (e.g., irreparable harm) in order to obtain preliminary relief." Joshua A. v. Rocklin Unified Sch. Dist., 559 F.3d 1036, 1037 (9th Cir. 2009) (citing Drinker ex rel. Drinker v. Colonial Sch. Dist., 78 F.3d 859, 864 (3d Cir. 1996)). The relevant inquiry is therefore two-fold: First, what is the child's "then current educational placement"? And, second, who should pay for it? Zvi D. V. Ambach, 694 F.2d 904, 906 (2d Cir. 1982). For "implicit in the maintenance of the status quo is the requirement that a school district continue to finance an educational placement made by the agency and consented to by the parent before the parent requested a due process hearing." Id.

**III. DISCUSSION**

Plaintiffs argue that they "consented to J.H.'s eligibility and consented to a number of services that the District never implemented, with the exception of OT. Further, the District continued to offer to provide services to J.H. while he attended a private placement at Plaintiff's expense based on the initial September/October IEP." (Pls.' Mem. 13:10-15.) As a result, Plaintiffs argue that J.H.'s stay put placement "should include

11

placement at the private school, at Parents' expense with the OT services implemented by the District and continuation of reimbursement of the LAS and behavior services to Plaintiffs as outlined in the administrative decision." (Id. 13:16-20.)

The Court agrees. Pursuant to 34 C.F.R. § 300.518(c), "the public agency must provide those special education and related services that are not in dispute between the parent and the public agency" in order to comply with the stay put provision. Prior to the disputed January 2009 IEP, the District and J.H.'s parents reached an agreement as part of the September/October 2008 IEP that J.H. would attend private school at his parents' expense and that the District would provide him with (1) a PKIT, (2) OT services for 120 minutes per month and OT clinic for 60 minutes per month; (3) LAS instruction one to five times per month for 60 minutes per month; (4) BII services with a non-public agency for 720 minutes per week; and (5) BID services for 180 minutes per month.

Furthermore, where the due process hearing officer "agrees with the child's parents that a change of placement is appropriate, that placement must be treated as an agreement between the State and the parents" for purposes of the stay put provision. 34 C.F.R. § 300.518(d). In this case, the ALJ "agree[d] with the child's parents" that two changes of placement they implemented- the provision of BII/BID services through STAR and the provision of additional weekly LAS services- were "appropriate." Specifically, the ALJ concluded that the District denied student a FAPE by (1) making a substantively inappropriate offer of one hour per week of LAS, when 150 minutes per week is necessary and (2) failing to provide J.H. with the agreed upon BII/BID services, as FACT refused

12

to work with children who are not toilet trained. As a result, the ALJ ordered the District to reimburse J.H.'s parents for their expenses spent on BII/BID and LAS services.

The District argues, however, that the ALJ "found that the private placement of J.H. in [a non-public school] was <u>inappropriate</u>, and that the District's offer of placement at the initial IEP was appropriate." (Opp'n to Ex Parte App. 4:9-12 (emphasis in original).) The District asserts that Parents should be required to continue funding J.H.'s behavioral and LAS services because "[t]he ALJ in the instant matter did not find that the September 10, 2008, IEP placement at the PCC at Westminster to be inappropriate, however, the ALJ found that the Garden School is inappropriate to meet Student's unique needs." (Opp'n to OSC 7:13-15.)

This argument is beside the point. Parents are not asking to be reimbursed for their placement of J.H. in private school, the placement that is subject to the instant dispute and as to which Parents and the State have never reached an agreement. Rather, Parents argue that the District must provide J.H. with the services they expressly agreed to provide in October 2008, as modified by the ALJ's order for reimbursement.

In responding to the Plaintiffs' Ex Parte Application, the District completely ignored Plaintiff's argument that the District is required to "provide those special education and related services that are not in dispute," 34 C.F.R. § 300.518(c), and suggests that because the ALJ disagreed with parents as to one part of the IEP, he did not agree with them as to any part of it.

///

13

That is simply not the case. First, the IDEA's implementing regulations require only that the ALJ agree with the parents that "<u>a change</u> of placement is appropriate," not that <u>all changes</u> are appropriate, in order to establish an agreement between the State and the parents for purposes of the stay put provision. <u>Id.</u> § 300.518(d) (emphasis added). Second, courts have repeatedly found that an order for reimbursement predicated on a finding that a previous IEP was substantively inappropriate "constitutes a change in the child's current educational placement for purposes of interpreting the pendent placement provision, at § 1415(j) of the IDEA." <u>Bd. of Educ. of Pawling Central Sch. Dist. v. Schutz</u>, 290 F.3d 476, 484 (2d Cir. 2002); <u>see also</u> <u>J.M. v. Capistrano Unified Sch. Dist.</u>, 556 F.3d 900, 903 (9th Cir. 2009), <u>cert. denied</u> 130 S. Ct. 90 (2009) (implicitly recognizing that a reimbursement order based on a finding on the merits that the IEP was inappropriate provides the basis for a "viable argument for entitlement to 'stay put'"); <u>Winkelman v. Parma City Sch. Dist. Bd. of Educ.</u>, 51 IDELR 126 (N.D. Ohio Oct. 24, 2008) (concluding that an ALJ's reimbursement order for a year of private placement, even absent a finding that private placement was appropriate for the future, nonetheless obliged the district to pay for the private school pending resolution of the dispute as to the child's future placement).

In opposition to the OSC, the District now argues that while "[t]he ALJ determined that the District did not provide the LAS provider and the behavioral services did not meet Student's need," this 'does not equate to a finding that the placement was substantively inappropriate." (Opp'n to OSC 6:16-20.) The

14

District is simply wrong. Under a heading entitled "Did the District deny Student a FAPE by failing to implement the consented portions of the September 10-October 6, 2008 IEP, specifically the Behavior Services and LAS?" the ALJ concluded:

> [T]he District <u>denied Student a FAPE</u> with respect to the IEP offer of behavioral services as the District did offer to provide such services when Parents rejected the placement offer by the IEP team. The District offered to provide services, including BII, to permit Student to attend a community preschool. Although the choice of provider is at the option of the District, the provider must be able to provide services which meet the child's unique needs. Here, one of Student's unique needs was toileting. Since FACT, the designated provider of behavioral services, would not change diapers, <u>Student's toileting needs were not met.</u>

(DuBovy Decl. Ex. 3, ALJ Order ¶ 24 (emphasis added).) In addition, under a heading entitled "Did the District deny Student a FAPE by failing to make a substantively appropriate offer of FAPE at the September 10-October 6, 2008 IEP meetings by failing to provide for a sufficient amount of BII and BID services . . . [to] meet Student's unique needs in a general education program?" the ALJ concluded:

> [T]he District <u>denied Student a FAPE</u> since the amount of LAS is <u>inappropriate</u> to meet his unique needs in language and speech. Student suffers from apraxia. The proper level of speech therapy to treat this disability is that recommended by the American Speech and Hearing Association which is three to five times per week for a weekly total of 150 minutes. The District offer of one hour per week of LAS is an <u>insufficient amount of services to meet Student's unique needs</u>.

(<u>Id.</u> ¶ 33 (emphasis added).)

The ALJ's conclusion that these portions of the IEP consented to by the District and Parents were substantively inappropriate "constitutes a change in the child's current educational placement for purposes of interpreting the pendent placement provision, at § 1415(j) of the IDEA." <u>Schutz</u>, 290 F.3d at 484; <u>see also</u> <u>Capistrano</u>

15

<u>Unified Sch. Dist.</u>, 556 F.3d at 903. Therefore, the Court concludes that Plaintiff has made a sufficient showing that J.H.'s "then current educational placement" includes private placement at the Garden School for three and one half hours per day, four days per week at his parents' expense, along with BII, BID, OT, PKIT, and LAS services provided by the District.

## IV. CONCLUSION

For the foregoing reasons, the Court enters a Preliminary Injunction Enforcing the Stay Put during the pendency of this lawsuit. The Court ORDERS the District to continue providing J.H. with the following services:

1. A PKIT one to five times per month, for a monthly total of 120 minutes;
2. OT services one to five times per month, for a monthly total of 120 minutes; and
3. OT clinic once per week for 60 minutes.

In addition, the District shall continue to reimburse Parents for the following services:

4. One-to-one LAS services from Milestones for three hours per week;
5. Daily BII services from STAR while J.H. attends the Garden School; and
6. BID services from STAR one to five times per month, for a monthly total of 180 minutes.

IT IS SO ORDERED.

Dated: March 29, 2010

DEAN D. PREGERSON
United States District Judge

16